Thank you, Your Honor. My name is Ken Roberts and I represent the appellant in this action, Mr. Frydoun Sheikhpour, who is also the defendant in the underlying action. The briefs barely clearly describe what this dispute is about. My client bought two service stations, one in Manhattan Beach, one in South Pasadena. Both of them had a bushel full of problems in connection with the development of them. Chevron filed a legal action to seek recovery of the stations and that initial action ended in a resolution, a settlement. Mr. Sheikhpour maintained the South Pasadena station. It was changed brands and is still owned and operated by him as a shell station today. This case focuses now on the Manhattan Beach station. He was not able to complete the construction at that station because of what is documented in the record, and which is really not disputed factually by Chevron at all, of substantial contamination at the property. The record stands on the testimony of Mr. Sheikhpour, on documents that were submitted, which are documents from the Southern California Regional Water Quality Control Board, and Mr. Sheikhpour's expert who testified the contamination was substantial. It included the results of spreading some 2.4 million cubic yards of oil-saturated soil over the area, which included this station, following abandonment of above-ground reservoirs. Counsel, it all comes down to the settlement agreement, doesn't it? It does come down to the written settlement agreement. The question is whether the PSA was ever incorporated. Into the settlement agreement. Right. It comes down to two things with respect to the settlement, quite frankly. All right. And one is, was the PSA incorporated in the settlement agreement? The document, the settlement agreement, says that the parties are going to perform their obligations as provided and specified in the PSA. It specifically refers to the PSA, and we've cited those provisions of the settlement agreement for purposes of establishing what must be done. Well, now, when the references are made to the PSA, is it with respect to specific provisions of the PSA, or the PSA in total? It refers to what is to be done, the work to be done. But the settlement agreement, it seems to me, is very clear that Sheikhpour, if I say that correctly, must perform no matter what. There were no conditions that the remediation take place, which was part of the purchase and sale agreement. But the settlement agreement, it seems to me, makes it very clear that no matter what happens, whether, and it seems unjust and unfair, but that's what the settlement agreement says. No matter what he must complete, even though it was caused by the failure to remediate the, they couldn't finish because the contamination had not been removed. What do you, how do you get around the settlement agreement? I don't think I have to, I can accept that term, although I disagree with, you know, that narrow of a construction. Because I do believe the settlement agreement does accomplish and incorporate everybody's provisions and obligations relative to that particular project, regardless of that. Let us assume that we set all of that aside for a moment. Let us assume that we set that aside. It still remains undisputed that it is contaminated property. It is the fact that the claim and the assertion that that prevented him from completing it is undisputed. There's the issue of the jurisdiction to enforce the settlement agreement, which I can address, but I will put that towards the end and more directly respond to your question. Because California law now comes in and starts to make an application. California law says, by way of example, in connection with Civil Code section 664.6 and the Temney case which we have cited to you, it says that settlement agreements will not be enforced where they are, as you just observed, unjust. Where they would cause a forfeiture, where they would result in a violation of public policy. What case says that you don't enforce them when they're unjust? That is the Temney case. Do you think that's what Temney says? I can read the language. Well, I've read the language. I'm just trying to get your best case. My worry is this. There are general rules of contract law in California that when one party is prevented from performing by the other party, that enforcement is precluded. Correct. However, even in reading that law, I'm worried that based on what happened in this particular situation, based on the settlement agreements language itself, that we're really saying, I mean, we're really saying this agreement is the end all. We've thought about all these other situations. In fact, in this agreement, to give them more time, the termination of the agreement was extended for a time. If there was supposed to be a, if you will, paragraph suggesting that contamination would be the cause for delay, why isn't that in the agreement? Parties didn't contemplate it. At least my client didn't. Chevron did. They hadn't disclosed it. Well, you both knew Chevron was going to have to come in and do this. No, no, no, no. Not at the time. The contamination issue did not arise until the course when the ground was broken during the course of construction after that settlement agreement arose. That was not a condition preceding. That was not knowledge. And there is no evidence that the parties at the time they executed the settlement agreement knew of all this contamination. If that had been known, we would not be here today. Okay. What was Chevron's obligation then? Its obligation, as is cited even by the item that we requested judicial notice of, its obligation is to address and clean up that contamination so that the construction could be completed. The document that said of judicial notice said you must address and deal and remove the contaminants before you close up the site. The site was 90% complete. I'm having trouble understanding your earlier sentence when you said the contamination issue didn't even arise until the ground breaking. Do I understand that correctly? That's correct. Nevertheless, this whole arrangement was premised on the notion that everyone knew there was contamination. No, no. Chevron had agreed to take care of it. That's, if you look at the agreement, that takes you back to the PSA. If we go back to the PSA, that actually resulted in a disclosure. There were documents. Those documents didn't show any contamination. And so there is nothing in this record that would support that conclusion or that states that. And it's nowhere in Chevron's brief that says, gee, at the time they executed this settlement agreement for Manhattan Beach, they knew of that contamination. That is not in the record, and that is not the case. Well, give me the sequence again. You say the contamination didn't arise until the ground breaking. Was not discovered. Now, put that in the context of when was the PSA and when was the settlement agreement? PSA was, I believe, in the year of 2005. Okay. Settlement agreement, I believe, is in the year of 2008. September. September. Correct. And then when was ground breaking? October of the following year. It took him a year to get through the permitting processes in Manhattan Beach. It's a tough city. So they must have understood that there was a contamination issue at the time of the settlement agreement. And why do you conclude that? The only report that had been given to him by Chevron said there was none. Well, correct me if I'm wrong, but the PSA provided that Chevron remediate any environmental contamination. That's exactly right. It does not state that there is environmental contamination. Unless that was a possibility. Of course it's a possibility. This is a service station property. Of course there is a possibility. That doesn't mean that it is there. There are service station properties without it. But the agreement said that Chevron must remediate. They are allocating whose responsibility it will be to remediate if the contamination is present. Yes. It does not state there is contamination present. At no time did Chevron admit or acknowledge that there was contamination present until after it was discovered, after the ground was opened up. And even then Chevron took and advocated the position, which is in our brief initially. This isn't contamination. This is naturally occurring oil. And that was wholesale fabrication. They knew that was there. But it was discovered, in the context of this case, when the ground breaking opened, a year after, a year and a month. Let me ask you a question. What's my standard review on this particular issue? De novo. Is a de novo a decision to enforce the agreement? It is California law. It is de novo in purposes of interpreting the agreement. Well, sure. The interpretation of the agreement is de novo. But the decision to enforce the agreement is an abuse of discretion, isn't it, in California? Yes, sir, it is. I won't argue on that point. Well, isn't that what we're really talking about, is whether the agreement should have been enforced? It is both what the agreement provides, because we've already addressed it. Nobody's arguing about what the agreement provides. The agreement is clear on its face as to what it provides. But whether it should be interpreted is what we're really suggesting. In other words, what we're really saying is, can we suggest that the general rule of California, when one party is prevented from performing the agreement by the other party, the enforcement should be precluded, and whether that ought to apply to this agreement? And that is the general rule. And the answer to the question is yes, it should be. So what is my standard of review for the district court in determining whether the agreement should be enforced, given that general rule? I understand it to be abuse of discretion. And even if one assumes that it is abuse of discretion, but there are questions of interpretation that we've already talked about. Does it include the PSA or not?  That becomes an issue of de novo. But if we step aside from those and we say then it's abuse of discretion, it is abuse of discretion for a judge to stand with well-established law in California. As you just enunciated, what the rule in California... I know what the general rule is, but I also know that there are cases where agreements have been enforced nonetheless. And that becomes a factual application. So that's the judge's decision. And now I'm on abuse of discretion review to determine what to do. In a context where there was no conflicting evidence. Contrary to what the evidence of my client was, that it absolutely precluded it. Effectively, what Chevron says, and what that holding would say, because the judge's statement, the judge's very specific statement, was to say, I don't care. Because I don't care what they did. Because this said, it waives all contingencies. Well, what he's trying to do is determine how to enforce this agreement. And what he's saying is the ultimate language of this agreement does not, absolutely not, encompass that one will be stopped by reason of contamination or otherwise. This was a settlement. Your client got half the property back in the settlement. It covered the whole agreement, and we had one property left. And as far as he was concerned, the agreement said what it did, and therefore ought to be enforced. Now, all I'm saying is, what is my standard of review? And that's all I was asking you. Because that, to me, is quite important. I understand that. And even if you assume on that narrow application of that question that it's abusive discretion, then yes, he does stand on abusive discretion. Because that ruling of his would be the same as saying, Chevron, you can go out and build walls around and put guards on that property and preclude him from crossing the line and get the property back. You can self-help take that property back and affirmatively and positively interfere. And because that wasn't stated in the agreement, that you cannot interfere with him, then you can. And we're going to let you interfere. We're going to let you build the barricade. We're just as certain as it is that someone cannot go out there and build a fence around there, stop someone from completing what they have to do, and then say, gee, you didn't fulfill your obligation. We're going to take it back. California law is absolutely contrary to that. And to not apply that law in this context is an abuse of discretion. Because just as certainly as building a fence would stop him, so did this contamination, which they affirmatively determined. You may want to listen. I'm sorry. I just wanted to ask. Section 1.2 of the settlement agreement says in no uncertain terms, no contingency preventing Mr. Shakefore from completing the reconstructed obligations on or before the final completion deadline, whether within or outside his reasonable control, whether foreseen or unforeseen, or whether due to acts of God, shall constitute a basis for excusing the timely completion of the reconstructed obligations by or before the final completion deadline. Are you saying under California law we should give no effect to that? Under California law, the law says that even if that is in the agreement, if I affirmatively disable you from your performance, then I don't get to enforce it. Under California law, the cases say, because the ability to enforce is actually controlled by 664.6 and those cases, that's the statutory provision that a court acts on. Under California law, the court has absolute authority, even if the agreement, as you commented, we think it's unfair, it's unreasonable and unjust. The court has the absolute power under California law to say, we're not going to enforce that unfair and unjust agreement. Thank you, Counselor. Your time has expired. We'll hear from Chevron. Good morning, Your Honors. May it please the Court. My name is Samuel Taylor and I'm privileged to represent Chevron in this appeal. The history of the litigation from the time Mr. Sheepoor acquired this property in 2003. You've got to keep your voice up or turn your mics to you or something. We can hardly hear you. I'm sorry. The history of the litigation from the time Mr. Sheepoor acquired this property in 2003 and the purpose for that agreement, which was to establish the PMPA, Franchise Dealer Relationship, which is governed by federal law, in order that Mr. Sheepoor be a dealer and agree to reconstruct the property so that there was a new station at the site, has been clearly addressed and considered by the district court. We have here, as well has been, Chevron's efforts to get Mr. Sheepoor to comply with his rebuild obligations. The purpose of the settlement agreement was to put a final end to the serial excuses that had been experienced by Chevron, which prompted Chevron to file its litigation in 2007 for why Mr. Sheepoor could not meet its obligation under the contract, an obligation that all parties agreed was material to the franchise relationship under the PMPA. This latest excuse now has to do with environmental contamination. I'm pleased to say that notwithstanding everything that Mr. Roberts has said, the station is operational. I would invite you to gas up. It's a beautiful station. Get some hot dogs. It is an operational station, one which after Chevron Taken by some other operator. Well, Chevron had to take the property back, had to undo a lot of the things that had been done at this site, and had to respond, obviously, to the environmental agencies who were alerted by Mr. Sheepoor of conditions which, in Mr. Sheepoor's views, presented cancer risks to the community. All of these are part of the record where there are banners that were set up, meetings that were taken with the agencies to make his case that this was just a horrible environmental situation. None of that has interfered with Chevron's efforts to get what it bargained for from Mr. Sheepoor at the beginning of this exercise, which is a state-of-the-art Chevron station at that site, which would continue to be a part of the Chevron network. Mr. Sheepoor, may I ask a question? What is the value of the improvements made by Mr. Sheepoor on that property? That's not clear. Approximately. Well, you would ask me to guess on this. I would not be able to do that, quite frankly, comfortably, other than to say that none of it was useful to Chevron at the end of the day, for reasons because when this dispute arose, right up through the time and after the court enforced the settlement agreement, there were about $3.4 million in liens from vendors and the like that had been placed on this property, despite Mr. Sheepoor's agreement to return the property free of liens. So we have vendors who refused to provide the proof to Chevron and to the city of Manhattan Beach that certain permits that were required to certify that the improvements were safe and the like could be produced. That and the quality of the construction required Chevron to do a complete redo, and I can tell you, give you an approximation of those costs, and we would say that well over a million dollars was spent by Chevron, dollars that were not anticipated in this deal, was spent by Chevron to get the benefit of its bargain. But another aspect of your question really has to do with what we agreed, Chevron agreed that Sheepoor would be allowed to do. We had certain standards in terms of how the station would appear, but if Mr. Sheepoor wanted to put Italian dining on the top of the roof, or a coffee shop within the structure, or a car wash, he was free to do that so long as the basic integrity of Chevron's van brand was preserved. So in a sense we really didn't have that much of a control over what Mr. Sheepoor decided he would do. What we do know, I think, a couple of things. In terms of the environmental... On that point, counsel, I would like to have your response to Mr. Roberts' assertion that the contamination issue didn't even arise until groundbreaking. What's your perspective on that? Well, the first perspective is that the settlement agreement covers that contingency. At the time the property was acquired in 2003, the PSA had certain representations in it that defined what covered contamination was, and the scope of Chevron's responsibility to address it if it was addressed. This was going to be a shared responsibility depending on the source of the contamination. I understand Mr. Sheepoor was operating a service station at that time, so there were a number of aspects of the PCA that addressed that. We would say that the response to the discovered contamination, which, by the way, Chevron was advised of in January of 2010. The original deadline, if I'm not mistaken, was October 2009. At Mr. Sheepoor's request, Chevron extended that deadline for another four months despite the final deadline language in the settlement agreement, being careful to preserve all other terms of the settlement agreement, and only after that extension was extended was Chevron advised of the discovery of contamination. Chevron investigated it, as pointed out earlier. Is this contamination fuel oil related, or is this some other kind of contamination? Insofar as we can tell, it's petroleum hydrocarbons, it is a byproduct of service station operations, and a former tanker. We're not saying that we are not going to be responsible for some portion of the contamination. The PSA, as I said earlier, had Mr. Sheepoor doing the type of due diligence he would be familiar with, being a service station dealer, owning some 10 or 15 other stations, including some other Chevron stations. But the point of the settlement agreement was to eliminate all of the discourse, all of the conversation that might arise in the event something like environmental contamination was discovered. And the point warranting inference is that there was nothing about that occurrence which could not be said to be covered by the clear terms of the settlement agreement. And Mr. Sheepoor has never said that he abandoned the project because of the contamination. In fact, in the record you will see banners that were posted on the site where Mr. Sheepoor advised the community that he had abandoned the site and stopped working because out of a concern not to expose the community to cancer-causing agents and other inflammatory matters which were also the subject of the courts. Let me stop here just a little bit. Let me talk about the parole evidence rule. It seems to me, and Idaho has a totally different parole evidence rule than California. It doesn't seem to me California has a parole evidence rule. They let everything in to determine whether there's a contract, regardless. So I'm trying to figure out why the parole evidence rule would not have allowed the district judge to determine in this situation that the settlement really did go along with the general rule in California that if one party prevented the other from performing, the enforcement would not be precluded. I think there was a deference given to what the parties attempted to accomplish in the settlement agreement, which was to eliminate any excuse for the court. So did the judge consider parole evidence and then determine that? Well, the judge considered the declarations and the evidence that was submitted by Mr. Sheepfor in deciding the question whether the settlement agreement should be enforced. As the court has, and I think now all parties agree, that is governed by an abuse of discretion standard, deciding the Doi case authored by Justice O'Scanlan. The contamination issue and all of these other excuses that were raised, and there were a number of them. So you're suggesting then the court did allow in the evidence necessary, did make a determination after consideration of that evidence, or are you arguing that even in California, the parole evidence rule would not allow testimony here, which contradicted the plain language of the agreement? I think that I would argue... What are you suggesting? I am suggesting that the four corners of the agreement says what it said. And the court looked at other submissions that were presented to it as reasons why the settlement agreement should not be enforced. And in exercising this discretion, the court concluded that none of it prevented the operation of what the parties agreed, quite clearly within the four corners of the agreement. Well, let me ask you another question. If it's a general rule in contract law in California, that when one party is prevented from performing by the other party, enforcement is precluded, why isn't it an abuse of discretion not to apply that law? Well, I think the... Can the parties contract around the law? Well, I think there is law that the parties can contract around and others that they can't, but... That's pretty essential, isn't it, here? If the general rule in California is that, can the parties in their contract contract around that? Isn't that pretty essential for your argument? Yes. So, what's your answer? Did they? Did they try to contract around that? Well, we had an integration... Well, we had an integration clause, which has been... The underlying point of the integration clause was to confirm the completeness of the agreement that was reached between the parties and that the court decided to enforce. So, the question is whether there were other issues, other evidence that should have been considered in aiding the court's interpretation of the contract. And the issue of interpretation was not... was considered, I think, based on the four corners of the document. You'll agree with me as well that in California, a condition of forfeiture must be strictly construed against the party for whose benefit it is created. You'll agree with that? The general proposition, yes. Okay. If forfeiture is to be strictly construed against Chevron in this particular situation, then how am I to get around that general rule in California? The court has addressed in its underlying opinion is that there was no forfeiture in this case. There was a bargained for agreement where the parties clearly agreed to the consequences of the failure to complete the construction by the deadline. So, are they talking about liquidated damage clause? And they were just enforcing the liquidated damage clause? I'm having a tough time understanding what your argument is because I didn't see any liquidated damage clause language in the court's opinion. No, there was no liquidated damage in the court's opinion. The question had to do with whether or not... The issue of forfeiture, it came in the context of this argument that it was unfair to require Mr. Sheekpore to comply with what he agreed to do in the event the completion was not... the rebuild was not completed by the deadline. Because, he says, it was your fault. It was Chevron's fault. It failed to deal with the contamination. Well, the court... Yes, and that was the contention. And I think... And wasn't that true? No, it was not true. Covered contamination is defined in the PSA. It's contamination that existed prior to the closing of the transaction for the station, which occurred in 2003. Chevron is stepping up and agreeing to... has addressed all the contamination at the site. The issue of whether or not some of it will be responsible for... that Mr. Sheekpore will be responsible for some of it will be reserved for a later determination. But this issue had to be addressed by someone, either Sheekpore or Chevron. And it has been addressed, is the point. The question is whether or not... When was it completed? I mean, when was it addressed? When was the contamination taken care of? Wasn't it afterwards that Chevron came in when they took over the station again? Well, by a Regional Water Quality Board edict, which found both Mr. Sheekpore and Chevron responsible parties for investigating and characterizing the site. And given the fact that Mr. Sheekpore was doing nothing, of course we initiated the process at the time we were alerted to the discovery of contamination by exchanging with the Water Board on the scope of site characterization and the source of it and the like. These environmental issues tend to take some time. And we did not view, and certainly the agreement did not contemplate, that the deadline would be thrown out the window simply because it would take some time to address these issues. But again, the point that we want to underscore here is that there was nothing about... And there are plenty of stations that will show ongoing remediation... Well, your time has expired. All right. I apologize, Your Honor. Mr. Roberts, you have some reserved time. Five minutes in reserve. I'll try and be very brief, Your Honor. You only have one minute and 36 seconds, Counsel, and you'll see it if you look at the clock. That's your remaining time. I'll be exceedingly brief. Very well. Let me first address a couple of questions. Repeatedly in Counsel's argument, he's gone outside the record. Yes, I'll admit the station is open today. The building that Mr. Sheepport put there as a convenience store is there. It's in operation. The tanks that he installed in the ground, they're still there. They're being used. The car wash facility is there. The grading is there. Chevron finished it. The grading. They paved it. They pulled out and replaced the canopy. The station opened last month. So it's taken all this time that they said, Oh, Mr. Sheepport, you should have gotten this done. Chevron, with its resources, it took that time. Your Honor, you asked a question about can you contract around. I don't know that the question was ever answered. But the agreement specifically states, It will be controlled and it's subject to California law. So the settlement agreement contemplates application of all aspects of California law, including the general rules of California law. Did they contract around it? They could if they had so chosen to. But they didn't say, We're going to ignore it. If we stop you, you're still stuck. If there's contamination, you're still stuck. The question was asked, When was the contamination discovered? You ask that direct question. After stammering around and trying to think, He came up with the date, January 10th. That's not on the record. Now, with respect, I'm afraid your time has expired. Thank you very much. The case just argued will be submitted for decision. And we will hear argument in the last case of the morning, which is Eastwood Insurance v. Titan Auto.
judges: Nelson, O'scannlain, Smith